**IN THE COURT OF APPEALS OF TENNESSEE**

**EASTERN SECTION AT KNOXVILLE**

FILED

**August 27, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| BARBARA SPRUELL, | ) | HAMILTON CIRCUIT |
| | ) | |
| Plaintiff/Appellee | ) | NO. 03A01-9704-CV-00124 |
| | ) | |
| v. | ) | HON. ROBERT M. SUMMITT |
| | ) | JUDGE |
| KENNETH WAYNE SPRUELL, | ) | |
| | ) | |
| Defendant/Appellant | ) | VACATED and |
| | ) | REMANDED |

Catherine M. White, Chattanooga, for the Appellant

Leslie B. McWilliams, Chattanooga, for the Appellee

**O P I N I O N**

INMAN, Senior Judge

This acrimonious custody dispute was not alleviated by inordinate objections to testimony which served principally to obfuscate the issues and make a meaningful review more difficult.

The parties were divorced in July, 1991. Custody of their son, Jason, then seven years old,[1] was awarded to the appellee [hereafter, mother] with agreed-upon support and alimony. The latter award was unconditional for 24 months; thereafter it would continue an additional 36 months unless mother remarried or violated the cohabitation statute.

In April 1996, mother filed a petition for contempt alleging that the appellant [hereafter, father] terminated his alimony payments without cause, but if he was justified in doing so, his child support obligation should be increased.

Father responded by alleging that he learned in February 1996 that mother was cohabiting with a non-related member of the opposite sex, Dr. Fred Lansford,

---

[1]His date of birth is not revealed.

whom she married on April 7, 1996, thus justifying the termination of alimony. He

alleged a material change of circumstance with respect to the care and custody of

Jason: mother's meretricious conduct, her neglect of his basic needs, her

drunkenness, and her denigration of father.

Following a protracted trial the Court found:

(1)     That mother did not cohabit with her 'present husband' prior to their marriage in April 1996, and that father was indebted for two months' alimony;

(2)     That child support should be increased commensurate with the Guidelines;

(3)     That the evidence did not justify a change of Jason's custody;

(4)     That mother was entitled to an award for attorney fees.

Father appeals and presents for review the issues of:

(1)     Whether the Court erroneously concluded that the evidence was not sufficient to justify a change in custody;

(2)     Whether the Court erred in excluding statements made by Jason to his step-father;

(3)     Whether the trial judge improperly "hindered the ability of Jason to testify fully;"

(4)     Whether the Court erred in finding that mother had not "cohabited with two different men" since her divorce, and therefore was disqualified from receiving alimony;

(5)     Whether the adjustment of child support was erroneously made retroactive, and

(6)     Whether attorney fees were properly awarded.

Our review of the findings of fact made by the trial Court is *de novo* upon the

record of the trial Court, accompanied by a presumption of the correctness of the

finding, unless the preponderance of the evidence is otherwise, TENN. R. APP. P.,

RULE 13(d). There is no presumption of the correctness of the decision of the trial

Court on a question of law. *NCNB Nat'l Bank v. Thrailkill,* 856 S.W.2d 150 (Tenn. Ct.

App. 1993).

At the outset, we may observe that Jason, now 14 years old, appears to have

maintained his aplomb throughout the discord surrounding him. A steady Honor Roll

2

student, he is accomplished in music[2] and athletics, and is an active Boy Scout.

The record is replete with invectives each hurled at the other with respect to his/her inattentiveness to the needs of Jason. We need not reproduce the episodic events each recounted; there is substantial evidence that mother has an ongoing problem with alcohol, her denial of which in the face of well-nigh irrefutable proof to the contrary[3] is unsettling, to say the least. She apparently was less than candid about her involvement with Johnson, whom the proof revealed was her paramour; she began a live-in relationship with Dr. Lansford in February 1996, and married him in April 1996.[4] After two months he filed an action to annul the marriage which was pending at the time this case was heard. The record does not reveal in a meaningful way the reason for the pending annulment, nor the appellee's current status vis-a-vis Dr. Lansford. All in all, this record reflects her somewhat anemic denials of inappropriate parental conduct.

Arrayed against the evidence of mother's conduct is evidence that the father neglected Jason for much of his life and whose paternal interest was revitalized over money matters.

Tenn. Code Ann. § 36-6-106 requires that a custody determination 'shall be made upon the basis of the best interest of the child,' and mandates a litany of factors to be considered. One of these factors is the preference of the child if he is 12 years of age or older. Jason was 13 years old, and all of the evidence reflects that because of his stability and intelligence, his testimony was not only relevant, but highly desirable. The appellant insists that the trial Court hindered Jason's testimony by cutting him off during crucial answers. We reproduce pertinent portions of his testimony:

THE Court:   All right. We've had some questions about activities of your dad and your mom. So I'll ask you if you know of any activities that your mom

---

[2]He plays six instruments and sang with the Chattanooga boys choir for six years. The evidence indicates that he is mature beyond his years.

[3]Stark photographs taken by Dr. Lansford show her *en dishabille*, on the floor in an unconscious state, which she ascribed to medication, others to alcohol. She testified that her live-in relationship with Dr. Lansford was platonic in nature, made necessary because her house was damaged by the elements.

[4]He was married four times previously.

has done that looked like it wasn't quite right?  Do you know of any?

JASON SPRUELL:  Richard Johnson, he lived at our house for a while.  I know that he did that.  And I think - -

THE Court:  What did you mean that he lived at your house.

J. SPRUELL:  He lived at our house.  They slept in the same bed together.

THE Court:  Did you see them.

J. SPRUELL:  I've seen them.

THE Court:  Okay.  All right.

J. SPRUELL:  And, I think we stayed over a couple of nights with Bob McCallie and we stayed over there at his house.  A long time ago, we stayed over there maybe two nights I think.

THE Court:  Okay.  All right.  Any others?  This is just what I've renounced to them but and but go ahead get it in the record.  Did you have to - what happened to Johnson.

J. SPRUELL:  They just - - just had a big fight one day I remember and my mom was just throwing all of his stuff out of the garage because he was keeping his stuff in our house after they sort of broke up or something like that.  And she just through [sic] all of his stuff out of the house and he was bringing it back in and he just - - they broke up and we haven't heard from him since.

.   .   .   .   .   .

THE Court:  All right.  But you saying that you, I believe you said he was in the same bedroom as your mother for a while.  Is that a short period, a long period.

J. SPRUELL:  I think it might have been like two months maybe.  Like maybe a month or two months.

.   .   .   .   .   .

THE Court:  Do you know of any incidents where your mom might have done something else that you didn't like or felt wasn't right.

J. SPRUELL:  Drinking.  She's - -

THE Court:  All right.  Tell us what you know about that.

J. SPRUELL:  She's come home drunk.

THE Court:  Well, I'd rather you wouldn't say drunk.  I'd rather you tell me how she acted.  See I don't really want your opinion, but I want your knowledge of what she was doing.  First, did you actually see her drinking, I guess?

J. SPRUELL:  I've seen her drinking.

THE Court:  Okay.  I guess the same question, did you see your dad drinking?

4

J. SPRUELL:     I haven't seen my dad drinking.

THE Court:      Never?

J. SPRUELL:     I've seen him when they were still married and everything I've seen him drinking but I haven't seen him drinking in the past five years.

THE Court:      They both drink when they were married, is that what you're saying?

J. SPRUELL:     Yes, sir.

THE Court:      All right. Go ahead. Were you going to tell us something else about the drinking?

J. SPRUELL:     When we were in - -

THE Court:      Just what you know now.

J. SPRUELL:     We were in Reno one summer, we were driving somewhere and I had seen her and my cousins have seen her, she was drinking. And we got in a wreck on the way to this house in Wildwood. And we just got in a wreck and, I mean, me and my cousin, who were riding in there with me, we knew that she was - - that she had been drinking. And we were telling her to slow down and everything.

THE Court:      Did you see her drink?

J. SPRUELL:     I saw her drinking. She had beers in the car with her.

THE Court:      Okay. But you don't know how much she consumed actually?

J. SPRUELL:     (Moves head from side to side.)

THE Court:      Was there any - - do you know, I guess I shouldn't ask about what happened because that would be hearsay whether she went to Court or not, so don't answer that. Any other incidents where you have seen your dad or your mom or anybody like that that did something wrong you felt?

J. SPRUELL:     No. I think that's it.

THE Court:      What about lately in the last year or six months, or anything. Have you seen either of them acting improperly or what you thought was improper?

J. SPRUELL:     Well, my mom - - the last time I saw her drinking I think it might have been maybe two months ago. But then I haven't seen her, like, drinking other than that.

.   .   .   .   .

THE Court:      Now do you have a good relationship with your dad?

J. SPRUELL:     It's very good between my dad.

THE Court:      And you have a good relationship with your mother?

J. SPRUELL:        Yes.

.    .    .    .    .

THE Court:         Okay.  All right.  You got one question.  Now, let me say this.  I don't ask you where you want to live.  I think it's too much for a youngster to have to try to make that judgment.  But the statute says that a lawyer can ask you.  And you can answer it in the way you feel you want to.  Whether it has an effect on me or not I don't know.  But she's got a right under the statute to ask you that question.

MS. WHITE:         Jason, just to explain, it's not to put you on the spot or make you uncomfortable.  His Honor is trying to make a decision about what's in your best interest.  So having said that, I'm going to ask you if you have a preference of where you would like to live in terms of which parent?  And then let you tell the Court why.

THE Court:         There again, you don't have to answer that.  But if you wish to, you can.  I think it's too much for a youngster.  But then the statute says that you can be asked that.  Whether you want to answer is up to you.

J. SPRUELL:        I don't know where I want to live.  I mean, I love both of them just the same and, I guess, I'll live wherever you tell me to.

THE Court:         All right.  Anybody else?

MsMcWILLIAMS:      Jason, living with your dad - -

THE Court:         You can't ask it - - wait, wait, wait - -

MsMcWILLIAMS:__    I'm sorry, Judge.  That was just a follow-up to what she had asked.  That's all that is.

THE Court:         No, I think we better leave it alone.

MsMcWILLIAMS:      Well, I'm not asking his preference, I'm asking him about visitation.

THE Court:         Oh, oh.  Okay.  Visitation.  Well, I can ask him about that.

MsMcWILLIAMS:      If he wants to continue - -

.    .    .    .    .

Appellant argues that the trial Court interrupted Jason's testimony and generally failed to follow-up with logical and pertinent questioning.  Perhaps the most serious error was telling Jason twice that he did not have to answer counsel's question concerning custodial preference,[5] in light of the statute and particularly in

---

[5]Jason could, of course, have been called as a courtroom witness.  This entails confrontation, the avoidance of which is salutary.  But the *en camera* proceeding is for the child's benefit, and he should have been allowed to express himself fully, frankly, and without hindrance or criticism.

6

light of the fact that Jason's custodial preference was the *sole* reason for the *in camera* proceeding.

But Jason, ever the diplomat, stated that he loved both of his parents, that they loved him, and he would live wherever he was told.

The appellant filed a post-trial motion for a psychological evaluation which the trial judge granted. This report was not reviewed by the trial judge, although it is included in the record before us. Because of its obvious hearsay nature we do not consider it under Rule 40, T. R. A. P. as post-judgment facts.

The appellant next filed a post-judgment motion seeking the appointment of a guardian *ad litem* for Jason. This motion was denied.

Jason was restrained from "contacting any other attorney,"[6] and his father was similarly restrained from "arranging for the child to have an attorney." The record does not reveal the reason for this action.

In light of our disposition of this appeal, we believe that a further recitation of the evidence would not be productive. Our concern, as it must be, is the advancement and protection of Jason's best interests. While he necessarily cannot be the sole arbiter of his destiny, he is absolutely entitled to express his views in an unimpeded setting. To this end, we conclude that the judgment should be vacated *in toto* and the case remanded for a new trial as to all issues. In doing so, we express no opinion as to whether Jason's custody should be changed; that decision must await a new hearing.

In light of all of the circumstances, particularly the colloquy between Jason and the trial judge, a proper decorum requires that the case should be heard by a different judge who is directed to consider the appointment of a guardian ad litem for him.

Costs are assessed to the parties evenly. This case is remanded to the trial curt for further proceedings, consistent with this opinion.

---

[6]It was revealed during argument that, after judgment was rendered, Jason decided he needed a lawyer. He apparently was motivated by his dissatisfaction with the *en camera* interrogation.

_____
William H. Inman, Senior Judge


CONCUR:


_____
Houston M. Goddard, Presiding Judge


_____
Charles D. Susano, Jr., Judge